1   Kathryn P. Salyer, OSB #883017
    Tara J. Schleicher, OSB #954021
2   Farleigh Wada Witt
    121 SW Morrison Street, Suite 600
3   Portland, Oregon 97204-3136
    Telephone: (503) 228-6044
4
        Attorneys for Debtor
5

6

7

8               IN THE UNITED STATES BANKRUPTCY COURT

9                   FOR THE DISTRICT OF OREGON

10  In re

11  SEQUOIA PARTNERS, LLC, an Oregon limited          Case No. 10-67547-fra11
    liability company,
12
                Debtor.
13
    SEQUOIA PARTNERS, LLC, an Oregon limited          Adversary Proceeding
14  liability company,                                Case No. 10-06270-fra

15              Plaintiff,                            COMPLAINT

16      v.

17  ROGUE RIVER MORTGAGE, LLC, an Oregon
    limited liability company, LYNN
18  COSTANTINO, an individual, and PARADISE
    RANCH LAND DEVELOPMENT, LLC, an
19  Oregon limited liability company,

20              Defendant.

21              **FACTS COMMON TO ALL CLAIMS**

22                  **Parties and Jurisdiction**

23                          1.

24      Plaintiff Sequoia Partners, LLC, ("Sequoia") is a limited liability company

25  organized and existing under the laws of the State of Oregon and authorized to do business, and

26  doing business, in Josephine County, Oregon. Sequoia is the developer of Paradise Ranch Resort

*FARLEIGH WADA WITT*
Attorneys at Law
121 SW Morrison Street, Suite 600
Portland, Oregon 97204-3136
Telephone: (503) 228-6044
Facsimile: (503) 228-1741

1    and Planned Community (the "Project").   The Project is a destination resort consisting of an 18-

2    hole golf course and visitor-oriented accommodations, restaurant, convention and meeting

3    center, pro shop, retail building, swimming pools, tennis courts, a spa and fitness center, 100

4    overnight accommodations and 200 single family dwellings.

5                                                    2.

6            Defendant Rogue River Mortgage, LLC, ("RRM") is a limited liability company

7    organized and existing under the laws of the State of Oregon and authorized to do business, and

8    doing business, in Josephine County, Oregon. RRM is engaged in the business of mortgage

9    lending and is a self-styled arranger of "creative financing."  As such, it often acts as an agent for

10   individual investors in connection with financing transactions and acted in such capacity in

11   connection with the various loans described herein.

12                                                   3.

13           Defendant Lynn Costantino ("Costantino") is a member of RRM and is a licensed

14   loan originator working for RRM.  He is a resident of Jackson County, Oregon.

15                                                   4.

16           Defendant Paradise Ranch Land Development, LLC, ("PRLD") is a limited

17   liability company organized and existing under the laws of the State of Oregon and authorized to

18   do business, and doing business, in Josephine County, Oregon. Its members are believed to

19   include RRM, Costantino and certain individual investors for whom RRM acted as an agent in

20   connection with the matters alleged herein.

21                                                   5.

22           Sequoia acquired the property commonly known as Paradise Ranch Resort from

23   Hillebrand Paradise Ranch Resort, Inc., on or about November 10, 2003.  Sequoia subsequently

24   retained Carling of America, Ltd., ("Carling") as construction manager and general contractor in

25   connection with development of the Project.

26

**Page 2 of  15 - Complaint**
P:\DOCS\SEQUPA\62136\PLDG\31D7589.DOC

*FARLEIGH WADA WITT*
Attorneys at Law
121 SW Morrison Street, Suite 600
Portland, Oregon 97204-3136
Telephone: (503) 228-6044
Facsimile: (503) 228-1741

**Financing Arrangements**

6.

On or about January 23, 2004, RRM and Sequoia executed a promissory note and trust deed pursuant to which RRM provided funds for the initial development efforts of the Project.

7.

On or about November 2006, Sequoia also obtained financing from RRM for the benefit of the L. Hillebrand Ranch Corporation pursuant to a promissory note and trust deed.

8.

During the next four years, Sequoia, via Carling, began their development efforts, focusing a majority of their initial resources on the complex land use issues the Project presented.

9.

On or about October 23, 2007, the Josephine County Planning Office issued its Site Plan Review Findings and Decision of Approval for the Project (the "Approval Decision"). A condition of the Approval Decision was that Sequoia provide Josephine County with financial assurance that it had funding to complete certain projects, including the resort structures, overnight villas, sewer treatment facilities, golf course, roads and utilities infrastructure, including remedial work in a public right-of-way of Josephine County ("Specific Projects"). An additional condition of the Approval Decision required Sequoia to furnish financial assurances to Josephine County to guaranty full completion of the Project prior to the final plat or sale of lots approved for single family dwellings within the Project.

10.

On or about February 13, 2008, Home Valley Bank agreed to loan $4.6 million to Sequoia for operating capital in connection with the development and construction of the Project. To memorialize this agreement, Sequoia executed one or more promissory notes, which notes

*FARLEIGH WADA WITT*
Attorneys at Law
121 SW Morrison Street, Suite 600
Portland, Oregon 97204-3136
Telephone: (503) 228-6044
Facsimile: (503) 228-1741

1  were secured by two deeds of trust described herein encumbering property that is part of the

2  Project. These notes and trust deeds have subsequently been assigned to South Valley Bank &

3  Trust, as successor in interest to Home Valley Bank.

4  11.

5  Between June 2008 and September 2008, Sequoia and RRM negotiated the terms

6  of the financial assurance required by Josephine County.

7  12.

8  Between February of 2008 and August 7, 2008, RRM provided additional

9  financing to Sequoia pursuant to additional advances from individual investors, which advances

10  were also secured by trust deeds on home lots within the Project. The trust deeds provided to the

11  individual investors by Sequoia are referred to collectively as the "Individual Trust Deeds."

12  13.

13  On or about September 2, 2008, RRM, Sequoia and Carling entered into an

14  Operating Agreement for Construction Loan and Security ("Operating Agreement"). A copy of

15  the Operating Agreement is attached hereto as Exhibit 1.

16  14.

17  Pursuant to the Operating Agreement, RRM agreed to loan Sequoia up to a total

18  of $25 million to complete the Specific Projects, as required by the Approval Decision. The

19  purpose of the Operating Agreement was to ensure that Sequoia had sufficient funds to complete

20  the Specific Projects as required by the Approval Decision, and to provide Josephine County

21  with assurances that the Specific Projects would be completed in accordance with the Approval

22  Decision.

23  15.

24  As security for repayment of the loans covered by the Operating Agreement,

25  Sequoia granted RRM a blanket deed of trust ("Blanket TD") on certain properties within the

26  Project, including the resort structures, overnight villas, sewer treatment facilities, golf course,

*FARLEIGH WADA WITT*
Attorneys at Law
121 SW Morrison Street, Suite 600
Portland, Oregon 97204-3136
Telephone: (503) 228-6044
Facsimile: (503) 228-1741

1    roads and utilities infrastructure ("Blanket Secured Properties").

2                                              16.

3           On September 8, 2008, RRM provided a letter to Josephine County confirming

4    their obligation and ability to finance development of the Project.  Specifically, RRM references

5    their commitment to provide $4.8 million in working capital for the duration of the Project.  A

6    copy of the September 8, 2008, letter is attached hereto as Exhibit 2.

7                                              17.

8           After the Operating Agreement was signed, approximately 96 trust deeds were

9    recorded against the Property.  The first is the Blanket TD in favor of RRM which was recorded

10   September 22, 2008.  The Individual Trust Deeds for RRM and/or its individual investors

11   securing the obligations described in paragraph 12 were recorded starting on October 1, 2008,

12   through April 28, 2009.

13                                             18.

14          In addition to the Individual Trust Deeds, Home Valley Bank recorded two trust

15   deeds, one trust deed in the amount of $3.9 million recorded on August 21, 2009, and a second

16   $5 million trust deed recorded on October 2, 2009.

17                                             19.

18          Despite its obligation to do so, RRM failed and refused to loan Sequoia funds

19   necessary to complete the Specific Projects, failed to deposit funds into trust accounts established

20   under the Operating Agreement to pay for enumerated construction items, and further failed to

21   provide funds sufficient to pay Carling for work performed on the Project.  This failure and

22   refusal resulted in a state of extreme economic distress and made it impossible for Sequoia to

23   timely complete its performance obligations and to pay its creditors, thereby placing the Project

24   in peril and leading to a devaluation of its worth and potential.  Despite its own failure to

25   perform, RRM wrongfully threatened Sequoia with foreclosure and used its secured position to

26   demand and ultimately obtain additional security from Sequoia.  These actions were taken in bad

*FARLEIGH WADA WITT*
Attorneys at Law
121 SW Morrison Street, Suite 600
Portland, Oregon 97204-3136
Telephone: (503) 228-6044
Facsimile: (503) 228-1741

1    faith and with the express purpose of damaging Sequoia.

2                                20.

3          The failure to fund the Operating Agreement and advance the working capital as

4    promised created significant economic hardship because plaintiff had relied on defendant RRM's

5    promises to loan funds and needed the funds to continue development.  The lack of funds caused

6    development to virtually grind to a halt.  As a result, plaintiff's efforts to sell individual home

7    sites were stymied, as potential buyers were concerned about the viability of the Project.  This

8    further caused financial distress to plaintiff, and further damaged the Project.

9                                21.

10         On July 2, 2009, RRM, Sequoia and Carling entered into a Standstill Agreement

11   ("Standstill Agreement").  A copy of the Standstill Agreement is attached hereto as Exhibit 3.

12   The purpose of the Standstill Agreement was to facilitate completion of the Project by heeding

13   RRM's demands for additional security.  Faced with RRM's wrongful threats, and financial

14   distress resulting from RRM's failure to loan funds and bad faith attempts to starve Sequoia out

15   of the Project, Sequoia and Carling signed the Standstill Agreement.

16                               22.

17         Pursuant to the Standstill Agreement, Sequoia executed and delivered a number of

18   Bargain and Sale Deeds ("BS Deeds") conveying the properties subject to the Individual Trust

19   Deeds to PRLD.  The purpose of BS Deeds was to further secure Sequoia's performance of the

20   Standstill Agreement.  The BS Deeds were intended as security for the performance of the

21   Standstill Agreement and were required by said agreement.  Pursuant to the Standstill

22   Agreement, all incidents of ownership of the subject properties remain with the plaintiff,

23   including the obligation to continue to develop and construct the property, to maintain all

24   construction improvements on the property, to pay all real property taxes assessed and owing

25   against the property, and to not permit the real property and improvements to suffer waste.  As is

26   true of traditional security documents, the Standstill Agreement provides a mechanism for the

*FARLEIGH WADA WITT*
Attorneys at Law
121 SW Morrison Street, Suite 600
Portland, Oregon 97204-3136
Telephone: (503) 228-6044
Facsimile: (503) 228-1741

1   security interest to be eliminated by the performance of the debtor's obligations, by providing

2   plaintiff the option to buy back the property, so long as plaintiff performs the Standstill

3   Agreement.

4                                              23.

5            Defendant RRM breached the Standstill Agreement by, among other things,

6   continuing to refuse to provide the funds required by the Operating Agreement.

7                                              24.

8            As a result of defendant RRM's breach of the Operating Agreement and Standstill

9   Agreement, plaintiff's remaining obligations under those agreements are excused and

10  discharged.

11                                             25.

12           Unless otherwise excused or discharged, Plaintiff has materially performed each

13  and every obligation of the Operating Agreement and the Standstill Agreement on its part to be

14  performed.

15                                             26.

16           Defendant Costantino interfered with Sequoia's performance of the Operating

17  Agreement and Standstill Agreement by, among other things,

18           (a)  Discouraging investors from investing loans in the Project;

19           (b)  Discouraging investors from purchasing certain lots in the Project, which

20                purchases would have provided funding under the Operating Agreement;

21           (c)  Personally purchasing certain lots within the Project that were otherwise

22                subject to the Blanket TD thereby diluting the collateral held by RRM; and

23           (d)  Failing to communicate funding needs of the Project to RRM investors who

24                had agreed to advance loans.

25

26

P:\DOCS\SEQUPA\62136\PLDG\31D7589.DOC

*FARLEIGH WADA WITT*
Attorneys at Law
121 SW Morrison Street, Suite 600
Portland, Oregon 97204-3136
Telephone: (503) 228-6044
Facsimile: (503) 228-1741

27.

Defendant Costantino's interference was undertaken using wrongful means, including breach of fiduciary duty and was motivated by an improper purpose, including specifically to acquire Plaintiff's interest in the Project for himself or others.

## FIRST CLAIM FOR RELIEF

### Declaratory Judgment Against Defendants RRM and PRLD

28.

Plaintiff realleges the allegations contained in paragraphs 1 through 27 above, and incorporates them herein by reference.

29.

The parties' opposing positions with respect to the interpretation of the Operating Agreement and Standstill Agreement, and the rights and obligations of the parties' thereto, is a present dispute, which dispute presents a justiciable controversy as to the meaning and interpretation of said agreements.

30.

Plaintiffs are entitled to a declaratory judgment as follows:

(a) Declaring that, as a result of economic duress, the Standstill Agreement is void and all transfers pursuant to it invalid, or alternatively;

(b) Declaring that, as a result of defendant RRM's breach of the Operating Agreement and Standstill Agreement, plaintiffs' remaining obligations are excused and discharged, and that plaintiffs are entitled to recover their damages;

(c) That the bargain and sale deed is a security instrument securing plaintiff's performance of the Standstill Agreement and that such deed is not an absolute deed;

(d) That defendant PRLD's rights under the BS Deeds are that of a secured

*FARLEIGH WADA WITT*
Attorneys at Law
121 SW Morrison Street, Suite 600
Portland, Oregon 97204-3136
Telephone: (503) 228-6044
Facsimile: (503) 228-1741

1   creditor without rights of nonjudicial foreclosure; and

2   (e)    Awarding plaintiffs their reasonable attorney fees and costs incurred

3   herein.

4   ## SECOND CLAIM FOR RELIEF

5   ### (Breach of Contract Against Defendant RRM)

6   31.

7   Plaintiff realleges the allegations set forth in paragraphs 1 through 30 above, and

8   incorporates them herein by reference.

9   32.

10  Defendant RRM breached the Operating Agreement and Standstill Agreement by

11  failing to loan funds and failing to deposit funds in the trust accounts to pay for construction and

12  development of the Project.

13  33.

14  As a result of defendant's breach, plaintiff is entitled to a judgment for damages

15  in an amount to be proved at trial, together with interest at the statutory rate, together with an

16  award of their attorney fees and costs incurred herein.

17  ## THIRD CLAIM FOR RELIEF

18  ### (Breach of the Covenant of Good Faith and Fair Dealing Against Defendant RRM)

19  34.

20  Plaintiff realleges the allegations contained in paragraphs 1 through 33 above, and

21  incorporates them herein by reference.

22  35.

23  As does every contract entered into in the State of Oregon, the Operating

24  Agreement and Standstill Agreement contain implied covenants of good faith and fair dealing.

25  Among other things, the covenants required that defendant RRM (1) refrain from taking actions

26  that would deprive the plaintiff of the benefit of their bargain, and (2) facilitate performance and

*FARLEIGH WADA WITT*
Attorneys at Law
121 SW Morrison Street, Suite 600
Portland, Oregon 97204-3136
Telephone: (503) 228-6044
Facsimile: (503) 228-1741

1   enforcement of the Agreements in the manner required to effectuate the contractual terms and/or

2   reasonable expectations of the parties.

3                                               36.

4          As set forth above, defendant RRM interpreted and enforced the Agreements in a

5   manner that fully deprived plaintiff of the benefit of the bargain.  While defendant obtained liens

6   encumbering the Project, it failed to advance funds for development, or fund the trust accounts,

7   thereby strangling the Project and depriving plaintiff of the funds necessary to complete

8   development.  It was not plaintiff's reasonable expectation that defendant RRM would fully

9   encumber the Project and them starve it for funds in order to acquire the Project for itself.

10                                              37.

11         As a result of defendant RRM's breach of the covenant of good faith and fair

12   dealing, plaintiff is entitled to a judgment for damages in an amount to be proved at trial,

13   together with interest at the statutory rate, together with an award of their attorney fees and costs

14   incurred herein.

15                          **<u>FOURTH CLAIM FOR RELIEF</u>**

16                **(Economic Duress Against Defendants RRM and Costantino)**

17                                              38.

18         Plaintiff realleges the allegations set forth in paragraphs 1 through 37, above, and

19   incorporates them herein by reference.

20                                              39.

21         Plaintiff executed the Standstill Agreement as a result of the wrongful threats and

22   interference, at a time when it was in extreme financial distress and had no reasonable

23   alternatives.

24                                              40.

25         Defendant Costantino aided and abetted defendant RRM's breaches of contract

26   and efforts to create financial distress for plaintiff and is liable for the damages caused thereby as

*FARLEIGH WADA WITT*
Attorneys at Law
121 SW Morrison Street, Suite 600
Portland, Oregon 97204-3136
Telephone: (503) 228-6044
Facsimile: (503) 228-1741

1    a joint actor.

2                                    41.

3           As a result of the economic duress, plaintiff is entitled to a judgment for damages

4    in an amount to be proved at trial, together with interest at the statutory rate, together with an

5    award of their attorney fees and costs incurred herein.

6                          **FIFTH CLAIM FOR RELIEF**

7              **(Promissory Estoppel Against Defendants RRM and PRLD)**

8                                    42.

9           Plaintiff realleges the allegations set forth in paragraphs 1 through 41, above, and

10   incorporates them herein by reference.

11                                   43.

12          Defendant RRM misrepresented its intent to loan funds to plaintiff and otherwise

13   support development of the Project.

14                                   44.

15          Plaintiff reasonably relied on the promises and representations of defendants

16   RRM and PRLD with respect to RRM's commitment to fund the development of the Project, and

17   it invested substantial sums and granted said defendants secured positions in the Project.

18                                   45.

19          A reasonable person in defendant RRMS and PRLD's position would have

20   foreseen plaintiff's reliance.

21                                   46.

22          By reason of the misrepresentations, plaintiff is entitled to recover from

23   defendants RRM and PRLD its damages for (1) out-of-pocket losses; (2) the loss of benefit of

24   the bargains measured by the difference between the value of the Project as developed and its

25   present value; and (3) its consequential damages.  In addition, plaintiff is entitled to recover its

26   reasonable attorney fees and costs incurred herein.

*FARLEIGH WADA WITT*
Attorneys at Law
121 SW Morrison Street, Suite 600
Portland, Oregon 97204-3136
Telephone: (503) 228-6044
Facsimile: (503) 228-1741

1

2                           **SIXTH CLAIM FOR RELIEF**

3                    **(Fraudulent Conveyance Against Defendant RRM )**

4                      **(Count One – USC §544(a) and ORS 95.230)**

5                                        47.

6          Plaintiff realleges the allegations set forth in paragraphs 1 through 46, above, and

7   incorporates them herein by reference.

8                                        48.

9          RRM failed to advance any funds to Sequoia under the Operating Agreement or

10  as stated in the Blanket TD.

11                                       49.

12         As set forth in 11 USC §1107, Sequoia has the powers of a "trustee" under 11

13  USC § 544 (a).

14                                       50.

15         Sequoia's delivery of the Blanket TD to RRM and RRM's recording of it in the

16  real property records for Josephine County constitutes a transfer of an interest of Sequoia's

17  property.

18                                       51.

19         Sequoia delivered the Blanket TD to RRM on or about September 22, 2008 and

20  RRM recorded it on that date as well (the "Transfer").

21                                       52.

22         Sequoia received no consideration or less than reasonably equivalent value in

23  exchange for the Transfer because RRM failed to advance to Sequoia any of the $25 million

24  consideration stated in the Blanket TD.

25

26

*FARLEIGH WADA WITT*
Attorneys at Law
121 SW Morrison Street, Suite 600
Portland, Oregon 97204-3136
Telephone: (503) 228-6044
Facsimile: (503) 228-1741

53.

Had Sequoia known that RRM would not fulfill its promise to advance the funds stated as consideration for the Blanket TD, Sequoia reasonably would have believed that it would incur debts beyond its ability to pay them.

54.

The Transfer is fraudulent under ORS 95.230 and Sequoia is entitled to avoid the Transfer of the Blanket TD to RRM under 11 USC §544(a).

**(Count Two – USC §544(b) and ORS 95.230)**

55.

Plaintiff realleges the allegations set forth in paragraphs 1 through 54, above, and incorporates them herein by reference.

56.

RRM failed to advance any funds to Sequoia under the Operating Agreement or as stated in the Blanket TD.

57.

As set forth in 11 USC §1107, Sequoia has the powers of a "trustee" under 11 USC § 544 (b).

58.

Sequoia's delivery of the Blanket TD to RRM and RRM's recording of it in the real property records for Josephine County constitutes a transfer of an interest of Sequoia's property.

59.

Sequoia delivered the Blanket TD to RRM on or about September 22, 2008 and RRM recorded it on that date as well (the "Transfer").

60.

Sequoia received no consideration or less than reasonably equivalent value in

*FARLEIGH WADA WITT*
Attorneys at Law
121 SW Morrison Street, Suite 600
Portland, Oregon 97204-3136
Telephone: (503) 228-6044
Facsimile: (503) 228-1741

1    exchange for the Transfer because RRM failed to advance to Sequoia any of the $25 million

2    consideration stated in the Blanket TD.

3                                               61.

4          Sequoia became insolvent as a result of the Transfer because based upon RRM's

5    actions, Sequoia was not able to pay its debts as they became due.

6                                               62.

7          The Transfer is fraudulent under ORS 95.240 and Sequoia is entitled to avoid the

8    Transfer of the Blanket TD to RRM under 11 USC §544(b).

9                          **SEVENTH CLAIM FOR RELIEF**

10          **(Tortious Interference with Contract Against Defendant Costantino)**

11                                              63.

12         Plaintiff realleges the allegations set forth in paragraphs 1 through 62, above, and

13   incorporates them herein by reference.

14                                              64.

15         Costantino's interference, as alleged above, was for improper purposes and/or was

16   made with improper motives.

17                                              65.

18         As a result of Costantino's interference with RRM's contractual relationship with

19   Sequoia, Sequoia has been damaged in an amount to be proven at trial.

20

21         WHEREFORE, plaintiffs pray for judgment as follows:

22         1.   On plaintiff's first claim for relief against defendants RRM and PRLD, for a

23              judgment declaring as follows:

24         (a)    Declaring that, as a result of economic duress, the Standstill Agreement, is

25                void and all transfers pursuant to it invalid, or alternatively;

26         (b)    Declaring that, as a result of defendant RRM's breach of the Operating

**Page 14 of 15 - Complaint**

*FARLEIGH WADA WITT*
Attorneys at Law
121 SW Morrison Street, Suite 600
Portland, Oregon 97204-3136
Telephone: (503) 228-6044
Facsimile: (503) 228-1741

1            Agreement and Standstill Agreement, plaintiffs' remaining obligations are

2            excused and discharged, and that plaintiffs are entitled to recover their

3            damages;

4     (c)    That the bargain and sale deed is a security instrument securing plaintiff's

5            performance of the Standstill Agreement and that such deed is not an

6            absolute deed;

7     (e)    That defendant PRLD's rights under the BS Deeds are that of a secured

8            creditor without rights of nonjudicial foreclosure; and

9     2.    On plaintiff's second, third, fourth, and fifth claims for relief against

10  defendant RRM, and fifth claim against PRLD, a money judgment for damages awarded in an

11  amount to be proved at trial, together with interest at the statutory rate;

12     3.    On plaintiffs' sixth claim for relief against defendant RRM, judgment that

13  the Transfer was fraudulent and should be set aside;

14     4.    On plaintiffs' seventh claim for relief against defendant Costantino, a

15  money judgment for damages awarded in an amount to be proved at trial, together with interest

16  at the statutory rate;

17     5.    For plaintiffs' attorney fees, costs, and disbursements incurred herein; and

18     6.    For such additional relief as the court may deem just and proper.

19     Dated: January 30, 2010.

20

                       FARLEIGH WADA WITT

21

22

23     By:/s/ Kathryn P. Salyer
          Kathryn P. Salyer, OSB #883017

24          (503) 228-6044
          ksalyer@fwwlaw.com

25          Of Attorneys for Debtor/Plaintiff

26

*FARLEIGH WADA WITT*
Attorneys at Law
121 SW Morrison Street, Suite 600
Portland, Oregon 97204-3136
Telephone: (503) 228-6044
Facsimile: (503) 228-1741

## OPERATING AGREEMENT FOR CONSTRUCTION LOAN AND SECURITY

This Agreement is entered into the 2nd day of September, 2008 between ROGUE RIVER MORTGAGE, LLC, an Oregon limited liability company ("RRM"), as "Lender/Administrator"; SEQUOIA PARTNERS, LLC, an Oregon limited liability company ("Sequoia"), as "Borrower/Developer"; and CARLING OF AMERICA, LTD., an Oregon corporation ("Carling"), as "Construction Manager/General Contractor".

### Recitals:

A.      Sequoia is developing Paradise Ranch Resort & Planned Community (the "Project") in Josephine County, Oregon pursuant to Site Plan Review Findings and Decision of Approval of the Josephine County Planning Director signed October 23, 2007 ("Decision of Approval").

B.      Pursuant to Condition 58 of the Decision of Approval, Sequoia is required to furnish financial assurances to guarantee full completion of the Paradise Ranch Destination Resort Project, as approved, prior to the final plat or sale of lots approved for single family dwellings within the Project.

C.      Pursuant to Condition 58, Sequoia has provided the County detailed cost estimates for completing the resort structures, overnight villas, sewer treatment facilities, golf course, roads and utility infrastructure, including remedial work in the Public Right-of-Way of Josephine County ("Specific Projects"). Copies of these detailed estimates are attached as Exhibit "A". Pursuant to this cost analysis, Sequoia has determined that completion of these facilities will cost approximately Twenty-Two Million Dollars U.S. ($22,000,000.00 U.S.D.). Although each of the Specific Project budgets have a contingency factor built in, the parties deem it prudent to provide for a total security of up to Twenty-Five Million Dollars U.S. ($25,000,000.00 U.S.D.) to assure completion of the Specific Projects. The purpose of this Agreement is to provide Josephine County with assurances that the Specific Projects will be completed in accordance with the Decision of Approval, and to provide a structure for the administration of the loans and financing required to complete these projects and the security mechanisms necessary to assure that all loan proceeds and proceeds from the sales of lots are used for the purpose of completing the Specific Projects in accordance with the Decision of Approval.

D.      Periodic assessment of the Specific Projects by the professionals involved in said Projects will take place every six (6) months in order to evaluate the percentage of work completed, and the value of the remaining work for the Specific Projects. It is understood that the implementation and completion of all Specific Projects will be spread over a period of up to three (3) years.

NOW, THEREFORE, the parties hereby agree as follows:

1.      Borrowing. RRM will loan Sequoia or assist Sequoia in obtaining loans from "Third Party Lenders" up to a total of $25,000,000.00 U.S.D., for the purpose of completing the

EXHIBIT   1
PAGE   1   OF   7

Specific Projects as required by the Decision of Approval. Each loan will be evidenced by one or more promissory notes, secured by RRM's and any Third Party Lender's trust deed as set forth in Section 6.

2.     Trust Accounts.    RRM has established six (6) trust accounts (the "Trust Accounts") at Home Valley Bank ("HVB") in Grants Pass, Oregon as follows:

- Trust Account No. 1:  Road and Utility Infrastructure; HVB account 03404241.

- Trust Account No. 2:  Golf Course Construction, Including Wetland Mitigation; HVB 03404043.

- Trust Account No. 3: Resort, Clubhouse, and Other Resort Facilities; HVB 03404050.

- Trust Account No. 4:  Overnight Villas; HVB 03404068.

- Trust Account No. 5: Sewer Treatment Facilities; HVB 03404076.

- Trust Account No. 6: Remedial Work in Josephine County Right-of-Way; HVB 03404258.

Funds from loans made by RRM or other Third Party Lenders for the purpose of completing construction on one of the Specific Projects outlined above shall be deposited into one or more of the Trust Accounts, as directed by RRM/Third Party Lender. In addition, RRM or Third Party Lenders may loan money to Sequoia for the purpose of servicing debt, general operations of Paradise Ranch, administration of the overall Project, and payoff for the land. Said funds are not subject to this Agreement.

3.     Administration of Trust Accounts.    The only authorized signer on the Trust Accounts shall be RRM. All checks over One Thousand Dollars U.S. ($1,000.00 U.S.D.) require the signature of two authorized RRM signers. Funds will be disbursed out of these accounts only at the direction of RRM. All funds in these accounts shall be held and disbursed in accordance with the terms of this Agreement for the purpose of assuring the completion of the Specific Projects as described above.

4.     Project Completion/Payment.    Carling shall act as Construction Manager/General Contractor for the completion of the Project. Carling shall complete or cause the completion of each of the Specific Projects. Carling shall submit detailed requests for construction draws two (2) times per month in the form set forth as Exhibit "B" ("Payment Request"). Each Payment Request will identify one or more of the six HVB Trust Accounts to be used for payment of the Payment Request, based upon amount of work completed under each category. Each Payment Request shall show the percentage of completed work included. Bi-monthly Payment Requests shall be submitted not later than the eighth of the month for payment on the tenth of the month, and not later than the 23rd of the month for payment on the 25th of the month. All Payment Requests and disbursements shall be in compliance with RRM's construction draw policy set forth on Exhibit "C".

EXHIBIT    (
PAGE   2  OF  7

5.    Administration of Payment Requests and Disbursements.

     5.1.    Payment Requests. Upon receipt of a Payment Request containing the required certification, RRM will inspect the work and verify that the work has been completed to the percent of completion stated in the Payment Request. If a Third Party Lender requires independent verification, RRM will verify that the Third Party Lender is satisfied with the results of its inspection before disbursing funds.

     5.2.    Disbursements. Upon approval of the Payment Request by RRM/Third Party Lender, RRM will disburse funds from the appropriate Trust Account to pay the Payment Request. All checks shall be payable directly to the contractor, rental company, or materials supplier furnishing work, equipment, materials, or other supplies or services covered by the Payment Request or otherwise required by the nature of the work.

     5.3.    Lien Releases. RRM shall require each payee to provide a partial lien release, releasing the Project from any claim of lien for all work, materials or other services provided through the date of the Payment Request, as a condition of payment.

     5.4.    Carling's Overhead/Profit. Carling shall be entitled to be paid overhead for administering the Project at the rate of seven and one-half percent (7.5%) of the actual costs for all work, equipment, materials, supplies, or other services contained in each Payment Request. In addition, Carling shall be entitled to a profit of four and one-half percent (4.5%) of such costs. Carling's profit shall be deferred until such time as each of the Specific Projects is Substantially Complete as defined in Section 7.1. At such time, Carling shall be entitled to receive its 4.5% profit from the remaining funds in the Trust Accounts, provided that sufficient funds will remain in each Trust Account to complete the work necessary to attain Final Completion, as defined in Section 7.2. Upon Final Completion, Carling shall be entitled to receive the balance of its profit.

    6.    Security. As security for repayment of all loans covered by this Agreement and the completion of the Specific Projects, Sequoia shall grant RRM a blanket trust deed on the property contained within the Paradise Ranch Resort & Golf Planned Community as set forth on attached Exhibit "D". All net loan proceeds from loans for the Specific Projects shall be placed in the appropriate HVB Trust Account. Sequoia shall grant Third Party Lenders a trust deed on the appropriate lots in the Project to secure their specific loans. For instance, funds received from a Third Party Lender for completion of the golf course shall be placed in Trust Account No. 2, and Sequoia shall grant that lender a trust deed on the golf course lots. Similarly, a loan for completion of the resort facilities and overnight villas will be placed in Trust Account No.'s 3 and 4, as appropriate to complete those projects, and the Lender will be granted a trust deed on the lots covering those facilities. RRM shall subordinate its trust deed to the trust deed of Third Party Lenders, but shall retain its trust deed on all of the property, subject to the release provisions set forth below.

    7.    Release of Security.

     7.1.    Substantial Completion. As each Specific Project attains "Substantial Completion", RRM will release its trust deed from that portion of the property representing the

EXHIBIT 1
PAGE 3 OF 7

Specific Project. For instance, when the overnight villas are substantially complete, RRM will release the lots upon which the overnight villas have been constructed from its trust deed. Any surplus in Trust Account No. 4 shall be transferred to one or more of the remaining Trust Accounts based upon their percentage of completion, the estimated amount necessary to complete the Specific Project represented by each account, and the funds available in said accounts. For purpose of this provision, Substantial Completion shall occur when the Specific Project is generally useable for the purpose for which it is intended. Substantial Completion shall be certified by an appropriate architect, engineer, or other professional. It is understood that in a project of this size and complexity there will always be some items of work that will need to be completed or corrected after such Specific Project is substantially complete. Upon certification of Substantial Completion, the parties will inspect the work and, together with the appropriate architect, engineer, or other professional, determine a reasonable amount to be held in the Trust Account to pay for all work and materials necessary to obtain "Final Completion".

       7.2.   <u>Final Completion</u>. Following Substantial Completion, Carling shall continue to prosecute the work on each Specific Project necessary to obtain Final Completion. Upon certification of Final Completion by the appropriate architect, engineer, or other professional, RRM shall disburse funds as necessary to make final payment for all work performed on that Specific Project, including Carling's profit. The Trust Account representing that Specific Project shall then be closed and any funds remaining shall be disbursed to one or more of the open Trust Accounts as RRM shall direct.

    8.   <u>Lot Sale Proceeds</u>.

       8.1.   <u>Escrow Agent</u>.   All sales of single family residential lots within the Project shall be closed in escrow at AmeriTitle in Medford, Oregon (or at such other title company as the parties and any Third Party Lender who has a trust deed on such lot shall agree) (the "Escrow Agent"). Upon execution of this Agreement, Sequoia shall deliver to AmeriTitle irrevocable escrow instructions substantially in the form set forth as Exhibit "E", and instructing the Escrow Agent to disburse all "Net Proceeds" of the sale as required by this Agreement. Net Proceeds are defined as any proceeds remaining after closing costs and escrow fees, title insurance, the brokerage fee, and disbursement required to release trust deeds on the lots.

       8.2.   <u>Disbursement of Net Proceeds</u>. All Net Proceeds shall be disbursed to one or more of the HVB Trust Accounts per the direction of RRM. RRM shall determine appropriate disbursement based upon the estimated cost of completion for remaining Specific Projects and the current funds in the accounts set up for those Projects.

    9.   <u>Public Works Improvements</u>. To secure the public works portion of the Project, which includes Monument Drive frontage improvements, Monument Drive half street waterline overlay, and Brookside Boulevard and Monument Drive signal, RRM has issued to Josephine County Public Works Department Irrevocable Standby Letters, as set forth in Exhibit "F". Such funds will not be released without specific approval of Public Works. Request for payments related to these funds shall be made on a monthly basis. Public Works shall inspect and approve releases in accordance with the County's normal policy in accordance with public works improvements.

EXHIBIT 1
PAGE 4 OF 7

10.    <u>Compensation.</u>

10.1.    <u>Administrative Fee.</u>  In consideration of RRM's administrative services described above, Sequoia shall pay RRM an administrative fee to be negotiated between the parties. The fee will be based upon actual administrative services rendered by RRM with respect to the processing of Payment Requests, disbursements, maintaining, monitoring, and applying lot sale proceeds to the Trust Accounts.

10.2.    <u>Security Fee.</u>  For the purpose of providing securities in accordance with Clause 58, a fee of .250 percent (1/4th of one percent) shall be paid as RRM's fee for providing the security as set forth in its August 5, 2008 letter to the Planning Director and this Agreement.

10.3.    <u>Loan Fee.</u>  A loan fee will be paid to RRM for any loan structured by RRM, based upon the conditions of the loan.

11.    <u>Default.</u>  The following shall be events of default by Sequoia:

11.1.    Failure to make any payment required by any note issued pursuant to this Agreement.

11.2.    Failure by Sequoia to cure any default in its performance under this Agreement or the trust deed securing this Agreement (or any Third Party Lender's trust deed) within thirty (30) days after receipt of written notice specifying with particularity the nature of the default and the cure that is required, provided that, in the event said default cannot be reasonably cured within said 30-day period, Sequoia shall not be in default under this provision so long as Sequoia initiates the cure required within said 30-day period, and thereafter diligently prosecutes the cure to completion.

12.    <u>Remedy.</u>  In the event of default, RRM shall be entitled to foreclose its trust deed in accordance with ORS 86.705-.795. In conjunction therewith, RRM shall be entitled to take immediate possession of the property and to do all things and acts necessary and reasonable in order to complete each and every one of the Specific Projects.

13.    <u>Notices.</u>  All notices and other communications under this Agreement must be in writing and will be deemed to have been given if delivered personally, sent by facsimile (with confirmation), mailed by certified mail, or delivered by an overnight delivery service (with confirmation) to the parties at the following addresses or facsimile numbers (or at such other address or facsimile number as a party may designate by like notice to the other parties):

To    Rogue River Mortgage, LLC:
      P.O. Box 706
      Grants Pass, OR 97528
      Attention: Lynn Costantino
      Facsimile No.: 541-476-6675.

///

///

EXHIBIT _1_
PAGE _5_ OF _7_

To:   Sequoia Partners, LLC
7000 Monument Drive
Grants Pass, OR 97526
Attention: Daniel Charbonneau
Facsimile: 541- 956-8574
E-mail: carling@charter.net

With a copy to: Gary C. Peterson
Foster Denman, LLP
P.O. Box 1667
Medford, OR 97501
Facsimile: 541-770-6502
E-mail: gpeterson@fosterdenman.com

To:   Carling of America, Ltd.
7000 Monument Drive
Grants Pass, OR 97526
Attention: Daniel Charbonneau
Facsimile: 541- 956-8574
E-mail: carling@charter.net

With a copy to: Gary C. Peterson
Foster Denman, LLP
P.O. Box 1667
Medford, OR 97501
Facsimile: 541-770-6502
E-mail: gpeterson@fosterdenman.com

Any notice or other communication will be deemed to be given (a) on the date of personal delivery, (b) at the expiration of the third day after the date of deposit in the United States mail, or (c) on the date of confirmed delivery by facsimile or overnight delivery service.

14.   <u>Miscellaneous</u>:

14.1.   <u>Governing Law</u>. This Agreement will be governed by and construed in accordance with the laws of the state of Oregon, without regard to conflict-of-laws principles.

14.2.   <u>Attorney Fees</u>. If any arbitration, suit, or action is instituted to interpret or enforce the provisions of this Agreement, to rescind this Agreement, or otherwise with respect to the subject matter of this Agreement, the party prevailing on an issue will be entitled to recover with respect to such issue, in addition to costs, reasonable attorney fees incurred in the preparation, prosecution, or defense of such arbitration, suit, or action as determined by the arbitrator or trial court, and if any appeal is taken from such decision, reasonable attorney fees as determined on appeal.

EXHIBIT __1__
PAGE __6__ OF __7__

14.3.  Modification.  This Agreement shall not be amended, terminated, or modified except in a single written instrument executed by both parties and approved by Josephine County.

ROGUE RIVER MORTGAGE, LLC
An Oregon limited liability company

By:    Anthony Lynn Costantino
Its:    Member
Dated:  Sep 1-3, 2008

SEQUOIA PARTNERS, LLC
An Oregon limited liability company

By:    Daniel Charbonneau
Its:    Member
Dated:  Sept 03, 08

By:    William R. Leep
Its:    Member
Dated:  Sept 05, 2008

CARLING OF AMERICA, LTD.
An Oregon corporation

By:    Daniel Charbonneau
Its:    President
Dated:  Sept 03, 08

Exhibits:

A:    Detailed Cost Estimates
B:    Payment Request Form
C:    Construction Draw Policy
D:    Blanket Trust Deed Form Securing RRM
E:    Irrevocable Escrow Instructions
F:    Irrevocable Standby Letters of Credit

EXHIBIT 1
PAGE 7 OF 7

# *Rogue River Mortgage, L.L.C.*

P.O. Box 706 • 225 N.E. "C" Street • Grants Pass, Oregon 97528
(541) 476-6672 • 800-659-6172 • FAX (541) 476-6675

September 8, 2008

Mr. Michael Snider
Planning Director
Josephine County Planning Dept.
510 N.W. 4th Street
Grants Pass, OR 97526

Re:    **Paradise Ranch Resort & Golf Planned Community**
       **Clause No. 58, "Financial Assurance for Completion"**

Dear Mr. Snider,

Rogue River Mortgage, LLC is pleased to provide you with this letter of assurance for the completion of
the Paradise Ranch Resort & Golf Project.

We have been involved with the project since 2004, and have monitored the development progress over
the years. We have already structured a total of $13,245,000 in loans on this project, the vast majority
coming from local investors who have viewed the property and are enthusiastic about bringing a facility
of this quality to southern Oregon. With the recording of final plat we are confident that we can continue
to find investors for the completion of the project, up to a total of $25 million, if necessary.

The loan to value ratio on this project is exceptional. We do not need to identify a single source for the
$22 million to complete the project. RRM specializes in finding private investors willing to loan money
for this type of project. We can raise money in increments as necessary to fund the construction process.
We have structured an agreement with Sequoia Partners, LLC and Carling of America, Ltd. that puts
RRM in charge of the loan proceeds and construction payments required to complete the Specified
Projects. Based upon our proven ability to obtain loans for the project, we are satisfied that Rogue River
Mortgage, LLC can obtain the funding that is needed to complete the project. The County shall not be
required to complete or oversee completion of the project in the unlikely event of a default by Sequoia.

The Operating Agreement and Trust Deed have already been executed by Sequoia Partners, LLC, as have
irrevocable instructions to the escrow company with respect to disbursement of loan proceeds. The Trust
Deed will be recorded prior to the recording of the Declaration and Final Plat. This Trust Deed provides
adequate security for RRM and its investors, up to the full amount needed for completion of the project in
conformance with the Decision of Approval.

Furthermore, RRM will provide the working capital for the daily operation of the developer/contractor for
the Paradise Ranch Project which is estimated at $4.8 million dollars for the duration of the project. The
industry standard for such construction project is 20% of the total of the gross.

Sincerely yours

Lynn Costantino

EXHIBIT    2
PAGE    1 OF 1

ESTABLISHED 1982 • REAL ESTATE INVESTMENT PROGRAMS

July 2, 2009

## STAND STILL AGREEMENT

THIS AGREEMENT is executed by and between Sequoia Partners, LLC, hereafter referred to as "Borrower", Carling of America, LTD, hereafter referred to "Contractor", and Rogue River Mortgage, LLC,  hereafter referred to as "Lender".

### RECITALS:

A.  Lender has through itself and other individual lenders as reflected on attached Exhibit 1, made loans to Borrower in the total principal amount of  $17,980,000 (Seventeen Million Nine Hundred Eighty Thousand Dollars) in connection with Borrower's development of a planned unit subdivision and destination resort known as Paradise Ranch Resort.  Lender and the individual lenders will hereafter collectively be referred to as Lender.  The resort will include an 18-hole golf course, visitor oriented accommodations, a restaurant, a convention and meeting center, a pro shop, a retail building,  swimming pools and tennis courts, a spa and fitness center, 100 overnight accommodations and 200 single family dwellings in a planned unit development located in Josephine County, Oregon.  The loans made by Lender to Borrower are evidenced by promissory notes and deeds of trust which have been recorded in the Official Records of Josephine County, Oregon.  The holders of the various deeds of trust and the recording dates of the deeds of trust are described in Exhibit 1.

B.  Borrower is in default of its obligations under the notes and deeds of trust because it has failed to pay sums due and owing thereon when due.  Borrower acknowledges that Borrower is in default under the notes and deeds of trust and that Borrower has no legal or equitable defenses that will prevent Lender from foreclosing the trust deeds.

EXHIBIT  3
PAGE  1  OF  10

C. Contractor has filed a lien against Paradise Ranch Resort property (including the lots upon which Lender has trust deeds).

D. Borrower agrees that the total amount owing under all the notes and deeds of trust described on Exhibit 1 is the principal sum of $17,980,000, plus accrued interest owing thereon in the amount of $832,924.81 through June 1, 2009, plus attorneys fees, costs and expenses of collection in the amount of $33,000 for a total amount of $18,841,924. Simple interest continues to accrue on the unpaid amount of the debt at the rate of 12% per annum or $5,911.24 per day from June 1, 2009 until paid. The total amount of the debt, plus accruing interest at the rate of $5,911.24 per day from June 1, 2009 until paid, will hereafter be referred to as the Total Debt Amount.

E. Borrower has requested that Lender forbear from enforcing its rights under the notes and deeds or trust. Lender has requested that Contractor release its construction lien and release any and all claims against Lender for construction costs set forth in said lien. Lender is willing to forebear from enforcing the notes and deeds of trust and foreclosing on the deeds of trust, Contractor is willing to release its construction lien and claims to recover construction costs and Borrower is willing to complete construction of the Paradise Ranch Resort including the residential lots covered by the deeds of trust described in Exhibit 1, under the terms and conditions set forth in this Agreement. Wherefore, it is hereby agreed as follows:

AGREEMENT

1. The recitals are incorporated herein by reference.

2. Borrower shall execute and deliver to Lender's designee, Paradise Ranch Land Development, LLC (hereafter "LLC") a bargain and sale deed conveying the residential lots

Stand Still Agreement - 2

EXHIBIT 3
PAGE 2 OF 10

covered by the deeds of trust attached hereto as Exhibit 1, subject to said trust deeds. The deed

will be recorded by LLC as soon as it is received. Notwithstanding this conveyance, Lender's

deeds of trust shall remain of record and shall continue as valid and existing liens upon the real

property and improvements described in said deeds of trust. Said deeds of trust may be enforced

and foreclosed in the event of a default of this Agreement, it being the intent of the parties that

there will be no merger of interests of any type with respect to the liens of the deeds of trust and

any ownership interest of LLC and that Lender retains the right to enforce the notes and deeds of

trust in the event of a default of this Agreement. Lender agrees that it will not allow LLC to sell

or convey said lots as long as Borrower is not in default of its obligations under this Agreement.

As long as Borrower is not in default of this Agreement, Lender will cause LLC to list the lots for

sale through Borrower's licensed real estate agent and use the proceeds of any sale as set forth in

this Agreement.

     3. Contractor agrees to release the construction lien it recorded against the Paradise

Ranch Resort on or about April 29, 2009 as Instrument No.2009-007262 and further agrees to

release and hereby does release Lender from any and all claims it may have against Lender and or

the real property and improvements of the Paradise Ranch Resort for construction work, labor,

materials, services, and equipment provided in connection with the development and

construction of the real property and improvements to date and at all times hereafter. Contractor

further agrees that it will not hereafter file a construction lien or assert any claims to recover

construction costs against Lender and against the Paradise Ranch Resort real property and

improvements including the lots conveyed to LLC, for any labor, materials, equipment or

services of any kind it or its subcontractors provide to the development and construction of the

EXHIBIT _3_

PAGE _3_ OF _10_

Paradise Ranch Resort hereafter.

4. If Borrower is not in default of its obligations under this Agreement, Borrower will be entitled to buy back the residential lots conveyed to LLC by paying the Buy Back Price, which will consist of all sums due and owing on the note and deed of trust encumbering said lot, including the principal balance of the note, plus all accrued interest at the note rate of 12% per annum, plus attorneys fees and costs of collection allocated to said lot by Lender, plus any liability insurance premium allocated to said lot by Lender, plus any real estate taxes owed on said lot and paid by Lender or LLC, plus any other costs, charges or assessments relating to the lot paid by Lender or LLC plus interest on any payments made at 12% per annum simple interest from the date of said payment. Borrower must exercise its buy back right upon the closing of a sale of any lot conveyed to LLC. Borrower's right to buy back lots will remain in effect only so long as the following conditions are satisfied:

A.   Borrower must substantially complete the following construction work by December 31, 2010:

> (i) Perform the wetlands work in Harris Creek and its riparian area which is related to the portion of the construction of the golf course which specifically impacts Fairways 4, 11, 12 and 14; and all wetland work in the first quad;

> (ii) Infrastructure work for the first quad including installation of utilities, curbs, gutters, and asphalt paving for Lots 1 through 53 and Lots 192 through 201, plus Lot 204, including services to the gate house;

> (iii) Sewer line, completion of all construction documents and surveys plus installation of the sewer line and the return reclaimed water line from the southwest boundary of Paradise Ranch to the Clear Water technology site in the Rendata Industrial Park; and

> (iv) Completion of the golf course work including cart paths for Fairways 4,

EXHIBIT 3
PAGE 7 OF 10

11. 12 and 14 pertinent to the wetland work.

If this work is not substantially complete by December 31, 2010, Borrower will be in default of this agreement, lose its right to buy back the lots conveyed to the LLC and Lender may enforce all remedies provided by the notes and deeds of trust.   For purposes of this Agreement, the term "substantially complete" means that the construction work is completed to the point necessary to allow the improvement to be used for its intended purpose.  For example, in connection with the street work, the streets would be paved and the concrete would be installed for the curbs and gutters;

B.  Borrower pays all real property taxes assessed and owing against Paradise Ranch Resort by September 30, 2011 and thereafter pays all real property taxes assessed and owing by September 30 of each calendar year thereafter; and

C.  Borrower pays the Total Debt Amount as follows:  Borrower will pay Lender,  by September 30, 2011, 25% of Total Debt Amount.  If 25% of the Total Debt Amount has been paid to Lender by said date, the buy back right will continue for another year, but will terminate, without notice to Borrower,  if another 25% of the Total Debt Amount has not been paid to Lender by September 30, 2012.  If 50% of the Total Debt Amount has been paid to Lender on or before September 30, 2012, the buy back provision will be extended for an additional year.  If another 25% of the Total Debt Amount  has not been repaid to Lender by September 30, 2013, the buy back provision will terminate, without notice to Borrower.  If by September 30, 2013, 75% of the total debt amount has been repaid to Lender, the buy back right will continue for another year. If the remaining balance of the Total Debt Amount  has not been repaid to lender on or before September 30, 2014, the buy back provision will terminate as of said date, without notice to

EXHIBIT  3
PAGE  5  OF  10

Borrower.  For purposes of calculating the 25, 50, 75 and 100% payment of the Total Debt

Amount, the calculation will be based on the Total Debt Amount set forth in Recital D including

the accruing interest.

5.  When any of the lots conveyed to LLC under this Agreement, are sold to third parties at

a time when Borrower is not in default of its obligations under this Agreement and has a buy back

right, the Buy Back Price will be paid to Lender holding the note and deed of trust covering said

lot and Lender will satisfy or reconvey said deed of trust.  LLC will convey the lot to Borrower in

exchange for payment of the buy back price to Lender.  The remainder of the sale proceeds, if any,

after deducting closing costs and a 10% administrative/broker fee payable to Borrower and its real

estate sales broker, will be paid to Rogue River Mortgage LLC and deposited into one of the trust

accounts described in the Operating Agreement For Construction Loan And Security dated

September 2, 2008 and executed by and between Rogue River Mortgage, LLC, Borrower, and

Contractor (hereafter the "Operating Agreement") and will be disbursed pursuant to the terms of

the Operating Agreement.

6.  Borrower will structure and obtain its own financing to complete the development.

Borrower will utilize the golf course, club house, overnight villas and its remaining home sites to

secure adequate funding for construction.  Said funding will be deposited in the trust accounts

described in the Operating Agreement and be disbursed pursuant to the terms of the Operating

Agreement.

7.  Lender will not have responsibility for completing or paying for the completion of the

construction of the development, except as may be provided in the Operating Agreement.

8.  Borrower may retain Contractor to prosecute the scope of work required to be

EXHIBIT 3
PAGE 6 OF 10

completed prior to December 31, 2010 and will direct Contractor to submit standard construction payment applications for monthly payments as the work progresses to Rogue River Mortgage LLC as provided in the Operating Agreement. Rogue River Mortgage LLC will verify the work and approve payment. Contractor will provide lien waivers in exchange for payment. Payment for all approved work will be made within ten (10) days after receipt of request for payment pursuant to the terms of the Operating Agreement, provided that adequate back up documentation is provided by Contractor to Rogue River Mortgage, LLC with the payment application.

9. Borrower may prepay sums owing to Lender at any time. There will be no prepayment penalty. However all prepayments shall first be applied to accrued interest owing on the Total Debt Amount with the balance to principal.

10. Borrower agrees to maintain all construction improvements, including the golf course, and not permit the real property and improvements of the Paradise Ranch Resort to suffer waste.

11. Borrower agrees that LLC and Lender will not be charged homeowners' association assessments or dues and/or golf club assessment, fees, dues, and/or costs by reason of the fact that LLC holds title to the lots conveyed to it under the terms of this Agreement. Such fees, costs, dues and assessments will not be charged to the lots which are the subject of this Agreement or the owners thereof until such time as the lots are sold to third parties.

12. Borrower will be in default of its obligations under this Agreement in the event it (a) fails to substantially complete the construction work described above by December 31, 2010, (b) fails to make a payment under this Agreement as set forth in paragraph 4(C), (c) allows a construction lien to be filed against Paradise Ranch Resort real property and/or improvements including the lots covered by Lender's deeds of trust without having the lien removed within 30

EXHIBIT 3
PAGE 7 OF 10

days of the recording of the lien, (d) files a petition for bankruptcy, (e) is involuntarily dissolved, (f) fails to comply with the requirements and conditions of the Findings & Decision of Approval, (g) fails to comply with the terms of the Operating Agreement, (h) fails to comply with its obligations under this Agreement or (i) fails to pay all real property taxes levied or assessed against Paradise Ranch Resort as required in this Agreement. In the event of a default, the buy back provisions set forth herein will terminate and be of no further force and effect, LLC may convey the lots directly to Lender, Lender may seek to enforce the terms of their notes and deeds of trust even though they are record owners of the lots, it being all parties' intent that Lender's ownership interest will not merge with their lien rights and remedies under the notes and deeds of trust if LLC conveys the lots to Lender. Lenders shall have the rights to enforce their deeds of trust by initiating judicial or non-judicial foreclosure proceedings with respect to said deeds of trust and Lender may pursue any other rights and remedies available to it under the terms of this Agreement, the notes, the trust deeds and applicable law. All of these remedies are to be cumulative.

12.  Time is of the essence with respect to all time deadlines stated herein.

13.  Nothing in this Agreement shall limit Lender's rights and remedies under their notes and deeds of trust in the event of Borrower's failure to comply with its obligations under this Agreement.

14.  Should any provision of this Agreement be held void or unenforceable, all other provisions shall remain valid and enforceable.

15.  Borrower and Contractor acknowledge, warrant, represent and agree that in executing and delivering this Agreement, they do so freely, knowingly and voluntarily, that they have had

EXHIBIT *3*

PAGE *8* OF *10*

an opportunity to and did discuss the terms of this Agreement and the implications thereof with legal counsel, that they are fully aware of the contents and effects thereof, and such execution and delivery is not the result of any duress.

16. This Agreement may not be modified, supplemented or amended except in writing signed by all parties or their duly authorized representatives.

17. This Agreement constitutes the full, complete, total and integrated agreement and understanding of the parties with respect to the matters set forth herein and there are no oral promises, terms, conditions or obligations concerning these matters other than those expressly set forth herein.

18. The parties additionally declare and represent that they have not executed this Agreement in reliance upon any oral promise, representation or warranty not contained in this Agreement.

19. In the event of any conflict or ambiguity between this Agreement and the other written loan documents or other written agreements between the parties, such ambiguity or conflict shall be resolved in such manner as to give Lender the greatest rights and flexibility to enforce their rights under the notes, deeds of trust and this Agreement.

20. This Agreement shall bind and inure to the benefit of the heirs, legal representatives, successors and assigns of the parties hereto. In the event Borrower sells or transfers its interest in all or any portion of the Paradise Ranch Resort, Borrower will provide notice of this Agreement to the transferee as the parties have agreed that it is in the best interest of all parties that this Agreement not be recorded at this time.

21. No delay or failure by Lender to exercise any right under this Agreement and no

Stand Still Agreement - 9

EXHIBIT 3
PAGE 7 OF 10

partial or single exercise of that right. shall be deemed a waiver of said right.

Dated: _July 2, 2009_

Rogue River Mortgage, LLC

By _Anthony L. Hutin_

Dated: _July 2, 2009_

Sequoia Partners, LLC

By _____

By _____

Dated: _July 2, 2009_

Carling of America LTD

By _____

Stand Still Agreement - 10

EXHIBIT _3_
PAGE _10_ OF _10_