UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| IN RE ) <br> ) <br> SEQUOIA PARTNERS, LLC, ) <br> ) <br> Debtor. ) <br> SEQUOIA PARTNERS, LLC ) <br> ) <br> Plaintiff, ) <br> vs. ) <br> ) <br> ROGUE RIVER MORTGAGE, LLC, *et al.*, ) <br> ) <br> Defendants. ) <br> ROGUE RIVER MORTGAGE, LLC, *et al.,* ) <br> ) <br> Counterclaim Plaintiffs, ) <br> vs. ) <br> ) <br> SEQUOIA PARTNERS, LLC, *et al.,* ) <br> ) <br> Counterclaim Defendants. ) | Bankruptcy Case <br> No. 10-67547-fra11 <br><br><br><br><br> Adversary Proceeding <br> No. 10-06270-fra <br><br><br><br> MEMORANDUM OPINION |

BACKGROUND

Sequoia Partners, LLC (Sequoia) is the developer of a commercial real estate project in Josephine County known as Paradise Ranch Resort and Planned Community ("Paradise Ranch"). Its plans include an 18-hole golf course and visitor-oriented accommodations, restaurant, convention and meeting center, pro shop, retail building, swimming pools, tennis courts, spa and fitness center, 100 overnight accommodations and 200 single family dwellings. Sequoia acquired the Paradise Ranch property from Hillebrand Paradise

Page 1 - Memorandum Opinion

Ranch Resort, Inc.(HPRR) in 2003, with a portion of the property subject to a pre-existing 99-year lease in favor of L. Hillebrand Ranch Company (LHRC). The sale of the property was accompanied by a promissory note and secured by an $8 million deed of trust in favor of HPRR.

In 2006, Sequoia and LHRC (as lessee) executed a $1 million deed of trust on the property owned by Sequoia and subject to the lease (referred to as the "boot"), and on an adjoining piece of property which was not part of the original sale (referred to as the "heel"). The deed of trust secured a $1 million loan made by Defendant Rogue River Mortgage, LLC (RRM). HPRR subordinated its security interest in the boot and heel to the deed of trust held by RRM, leaving RRM with a first priority lien, followed by the lessee's interest, which was also subordinated to RRM's interest.

On June 28, 2007, a deed of trust was recorded in favor of RRM to secure $5 million in loans from RRM to Sequoia. Over time, the loan balance was increased and was about $13.4 million as of August 2008. The loan agreement provided that once a final plat was obtained for the development, the individual lenders' liens (liens for loans obtained through RRM from third parties) would be assigned to individual lots in the Paradise Ranch property.

In October 2007, Josephine County conditionally approved the project for zoning purposes. Section 58 of the County's Findings & Decision of Approval allowed for a final plat and the sale of single family lots only if the other portions of the project were first completed or if Sequoia provided a performance bond or "equivalent financial assurance" that they would be built. When Sequoia was unable to obtain a conventional performance bond, Sequoia approached RRM to provide an equivalent financial assurance. Certain disclosures and assurances were made by Sequoia to RRM as to the financial viability of the project which culminated in an Operating Agreement for Construction Loan and Security between Sequoia and RRM and Carling of America, Ltd, as Construction Manager and General Contractor. The Operating Agreement was prepared by Sequoia and signed by the parties to the agreement. The Operating Agreement, dated September 2, 2008, provided that RRM would loan Sequoia or assist Sequoia in obtaining loans from "Third Party Lenders" up to $25 million to complete the specific projects as required by Josephine County's Decision of Approval. In a letter dated August 29, 2008 from Sequoia's attorney containing a draft of the Operating

Page 2 - Memorandum Opinion

Agreement, he stated that "[r]ather than provide for a $25,000,000 note to RRM, which we know will not represent an actual loan from RRM, I have created a blanket deed of trust to cover all of RRM's and the third party lenders' responsibilities, up to $25,000,000."

The Operating Agreement provides that

> Sequoia has determined that completion of these facilities will cost approximately [$22 million]. . . . [T[he parties deem it prudent to provide for a total security of up to [$25 million] to assure completion of the Specific Projects [defined in the Agreement as six specific sub-projects within the overall project]. The purpose of this Agreement is to provide Josephine County with assurances that the Specific Projects will be completed in accordance with the Decision of Approval, and to provide a structure for the administration of the loans and financing required to complete these projects and the security mechanisms necessary to assure that all loan proceeds and proceeds from the sales of lots are used for the purpose of completing the Specific Projects in accordance with the Decision of Approval.

As previously noted, the Operating Agreement then provides that RRM will "loan Sequoia or assist Sequoia in obtaining loans from 'Third Party Lenders' up to a total of $25,000,000 U.S.D, for the purpose of completing the Specific Projects . . . . Each loan will be evidenced by one or more promissory notes, secured by RRM's and any Third Party Lender's trust deed as set forth in Section 6." Section 6 of the Operating Agreement provides in part:

> As security for repayment of all loans covered by this Agreement and the completion of the Specific Projects, Sequoia shall grant RRM a blanket trust deed on the property [of $25 million]. . . . Sequoia shall grant Third Party Lenders a trust deed on the appropriate lots in the Project to secure their specific loans. . . . RRM shall subordinate its trust deed to the trust deed of Third Party Lenders, but shall retain its trust deed on all of the property, subject to the release provisions set forth below.

Section 7 of the Agreement provides that "[a]s each Specific Project attains 'substantial completion,' RRM will release its [blanket] trust deed from that portion of the property . . . ." Thus, as each Specific Project attained substantial completion, RRM's blanket trust deed would be released from that portion of the project; when all six of the Specific Projects were completed, RRM/s blanket trust deed would presumably be released in total. Section 14.3 further provides that "[t]his Agreement shall not be amended, terminated, or modified except in a single written instrument executed by both parties and approved by Josephine County."

The Operating Agreement was submitted to Josephine County to guarantee completion of the entire project. The County found that the operating agreement satisfied the provision in Paragraph 58 requiring a

Page 3 - Memorandum Opinion

bond or equivalent financial assurance. In other words, the County found the Operating agreement to be the equivalent of a performance bond, at least for planning purposes. Josephine County's approval allowed Sequoia to record the final plat and authorized it to sell single family lots prior to completion of the other parts of the project.

After the county approved the project and the final plat was recorded, RRM facilitated an additional $3,450,000 in loans from individual lenders between September 15, 2008 and December 18, 2008. Pursuant to the Operating Agreement and the Loan Agreement for the June 28, 2007 trust deed, trust deeds for individual lenders were recorded against individual lots and RRM recorded a partial reconveyance of RRM's $5 million deed of trust as to the those lots.

Beginning in December 2008, a number of construction liens were recorded against the project which, according to RRM, prevented it from facilitating any new loans from individual lenders. Lenders were concerned that despite having obtained more than $3 million in new loans between September and December 2008, vendors were not being paid. Moreover, lot sales were not being made and, beginning in January 2009, Sequoia had stopped making monthly interest payments on the $5,000,000 and $1,000,000 notes and deeds of trust and had failed to provide an accounting to RRM and the individual lenders. In a letter to Sequoia's attorneys dated April 30, 2009, Sequoia's attorney disclosed that Sequoia's related entity Carling of America, Ltd. had filed a construction lien in an amount just under $8.2 million to protect its interest in a possible foreclosure by the investor group. RRM states that it was impossible to raise any additional funds from lenders after this construction lien filing as Sequoia could not obtain title insurance to insure the individual deeds of trust as first liens and the first lien status of previously recorded individual trust deeds was now called into question.

Sequoia counters that none of the post-final plat funds raised by RRM through individual lenders was deposited into the various construction trust accounts as required by the Operating Agreement, while RRM states that those funds were obtained for operating costs and, pursuant to the Operating Agreement, were not required to be placed in a construction trust account. In any case, RRM stopped funding the project in January 2009 and Sequoia was in default under the terms of its obligations to lenders.

Page 4 -   Memorandum Opinion

After some negotiation, Sequoia, Carling of America, and RRM entered into a Standstill Agreement on July 2, 2009 by which the parties agreed that RRM had made loans through itself or individual lenders to Sequoia in the principal amount of $17,980,000 which were evidenced by various promissory notes and deeds of trust, with a current balance due of $18,841,924. Sequoia acknowledged that it was in default under the terms of the notes and deeds of trust and that there were no legal or equitable defenses preventing the Lender from foreclosing. In exchange for Lender forbearance from exercising its foreclosure rights against the project, Carling agreed to release its construction lien and Sequoia agreed to execute and deliver to Lender's designee and affiliate, Paradise Ranch Land Development, LLC (PRLD), a bargain and sale deed conveying the residential lots covered by the trust deeds. Sequoia would thereafter be entitled to buy back the lots for an agreed price if it was not in default of the Agreement. By December 31, 2010, Sequoia was required to complete certain specified construction work, for which it was required to obtain its own financing, and thereafter was required to pay off Lender's debt in specified instalments.

Sequoia was unable to obtain financing to complete the work required by the Standstill Agreement and filed for bankruptcy protection on December 29, 2010. This Adversary Proceeding was filed on December 30, 2010, and Plaintiff has now filed this motion for summary judgment and Defendant RRM a cross-motion for summary judgment. Oral argument was made at a hearing conducted on July 18, 2012 and the matter was taken under advisement.

## SUMMARY JUDGMENT

Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, admissions, and affidavits, if any, show that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56, made applicable by Fed. R. Bankr. P. 7056. The movant has the burden of establishing that there is no genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). The court must view the facts and draw all inferences in the light most favorable to the nonmoving party. T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n, 809 F.2d 626, 630-31 (9th Cir. 1987). The primary inquiry is whether the evidence presents a sufficient disagreement to require a trial, or

// // //

whether it is so one-sided that one party must prevail as a matter of law.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986).

A party opposing a properly supported motion for summary judgment must present affirmative evidence of a disputed material fact from which a factfinder might return a verdict in its favor.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 257 (1986).  Fed.R.Bankr.P. 7056, which incorporates Fed. R.Civ. P. 56(e), provides that the nonmoving party may not rest upon mere allegations or denials in the pleadings, but must respond with specific facts showing there is a genuine issue of material fact for trial.  Absent such response, summary judgment shall be granted if appropriate.  See Celotex Corp. v. Catrett, 477 U.S. 317, 326-27 (1986).

## DISCUSSION

Plaintiff has filed a motion for summary judgment as to Claim 6, which alleges that certain trust deeds in favor of RRM and the bargain and sale deed executed as part of the Standstill Agreement constitute fraudulent transfers and should be avoided.  Claim 6 consists of six Counts. Counts 1 to 4 rely on the Debtor in Possession's (DIP) so-called "strong arm" power under Code § 544(b), which provides that a trustee (or a DIP) may "avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law by a creditor holding an unsecured claim that is allowable under section 502 of this title. . . ." :

**Count 1**:  Against RRM, under ORS 95.230 - $25 million blanket TD

Alleges that Sequoia granted RRM the beneficial interest in the $25 million blanket trust deed for no consideration or less than a reasonably equivalent value, because RRM failed to advance to Sequoia any of the consideration stated in the trust deed.

**Count 2**:  Against RRM under ORS 95.240 - $25 million blanket TD

Same allegations as Count 1.

// // //

// // //

// // //

Page 6 - Memorandum Opinion

**Count 3:** Against RRM under ORS 95.230 - $5 million blanket TD and $1 million RRM/LHRC TD

Alleges that the failure of RRM to reconvey the trust deeds to Sequoia despite having received replacement security from individual lenders who recorded individual trust deeds, constitutes a fraudulent transfer.

**Count 4:** Against RRM under ORS 95.240 - $5 million blanket TD and $1 million RRM/LHRC TD

Same allegations as Count 3.

**Count 5**: Against RRM under 11 U.S.C. § 548(a) - $5 million blanket TD and $1 million RRM/LHRC TD

Same allegations as Count 3.

**Count 6:** Against RRM and PRLD under 11 U.S.C. § 548(a) - Bargain & Sale Deed

Alleges that the execution and delivery of the bargain & sale deed to PRLD, for the benefit of RRM, was for no consideration and constitutes a fraudulent transfer.

Sequoia's motion for summary judgment is for Counts 1 to 6, while RRM's cross motion is for Counts 1 to 5 only.

Requirements Under Fraudulent Transfer Provisions

A. State Law Provisions

(1) "Transfer" defined at ORS 95.200(12):

> Transfer means every mode, direct or indirect, absolute or conditional, voluntary or involuntary of disposing of or parting with an asset or an interest in an asset, and includes a payment of money, a release, a lease and the creation of a lien or encumbrance.

(2) ORS 95.230 **- Transfers fraudulent as to present and future creditors.**

> (1) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:
> \*\*\*
> (b) Without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:
>     (A) Was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or
>     (B) Intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due. \* \* \*

// // //

Page 7 - Memorandum Opinion

(3) ORS 95.240 - **Transfers fraudulent as to present creditors.**

    (1) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor becomes insolvent as a result of the transfer or obligation.

B. Bankruptcy Code Provisions

(1) "Transfer" is defined at Code § 101(54) as:

    (A) the creation of a lien;
    (B) the retention of title as a security interest;
    (C) the foreclosure of a debtor's equity of redemption; or
    (D) each mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with --
        (i) property; or
        (ii) an interest in property.

(2) Code § 548, reads in relevant part:

    (a)(1) The trustee may avoid any transfer . . . of an interest of the debtor in property, or any obligation . . . incurred by the debtor, that was incurred on or within 2 years before the date of the filing of the petition, if the debtor voluntarily or involuntarily --
    ***
    (B)    (i) received less than a reasonably equivalent value in exchange for such transfer or obligation; and
        (ii)    (I) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation;
            (II) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital;
            (III) intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured; or
            (IV) made such transfer to or for the benefit of an insider, or incurred such obligation to or for the benefit of an insider, under an employment contract and not in the ordinary course of business.

<u>Evidence Supporting Counts 1 to 6 of Claim 6</u>

(1) **Counts 1 and 2:** $25 million blanket TD:

The $25 million blanket trust deed was granted as part of an integrated agreement to meet the demands of Josephine County that Sequoia provide a financial assurance that the project as a whole would be completed, and enabled Sequoia to begin selling single residential lots (and thus begin receiving revenues) prior to completion of the other parts of the project. It induced RRM to agree to either loan Sequoia the

Page 8 - Memorandum Opinion

funding to complete the project *or* to assist Sequoia in obtaining loans from third parties to do so[1]. Sequoia argues that the granting of the trust deed interest was for less than reasonably equivalent value because Sequoia did not ultimately provide the $25 million to Sequoia. However, the fact that RRM may not have carried through with whatever obligation it had to provide funding, does not diminish the value of the consideration it provided as part of the Operating Agreement at the time of the transfer.

RRM also argues that the Operating Agreement obligates it to foreclose its interest in the project and to complete it in the event of a default by Sequoia. The Operating Agreement does not explicitly contain this requirement, but it is possible to make such an inference from certain terms contained in the Agreement. Section 10.2 provides: "For the purpose of providing securities in accordance with Clause 58, a fee of .250 percent . . . shall be paid as RRM's fee for providing the security as set forth in its August 5, 2008 letter to the Planning Director and this Agreement." Section 12 provides:

> In the event of default, RRM shall be entitled to foreclose its trust deed in accordance with ORS 86.705-,795. In conjunction therewith, RRM shall be entitled to take immediate possession of the property and to do all things and acts necessary and reasonable in order to complete each and every one of the Specific Projects.

This language does not, by itself, make RRM a surety or guarantor of performance. However, such a duty might be inferred from the entirety of the evidence that RRM had made an undertaking to the County, or its investors, to assure completion of the project. Either way, the evidence in the record before the court is not sufficient to find either way.

Because there are material unresolved facts under ORS 95.230 as to the value of the obligations given in exchange for the $25 million trust deed interest and the requirements under subparts (1)(b)(A) and (B), summary judgment cannot be granted to either party for Count 1.

As for ORS 95.230, the same considerations regarding reasonably equivalent value also apply. The question of solvency is also unresolved. Sequoia argued at oral argument that it was rendered unable to pay

---

[1] The evidence suggests that it was understood between the parties to the Operating Agreement that there would be no loans made directly from RRM to Sequoia.

Page 9 - Memorandum Opinion

its ongoing debts as they came due during the time these events unfolded. However, solvency for purposes of ORS 95.230 is calculated on a balance sheet basis.[2] ORS 95.210(2) provides only a presumption of insolvency if ongoing debts are not paid. It is rebutted by proving the existence of solvency under subsection (1). Uniform Fraudulent Transfer Act 1984, § 2, Comment 2.

RRM argued that Sequoia is estopped from arguing insolvency based on the fact that in its schedules accompanying its bankruptcy petition it listed the value of its assets at $57,507,384 with total liabilities of $45,932,818. Judicial estoppel is available, however, only when a change in position would adversely affect the judicial proceeding or constitute a fraud on the court. Black's Law Dictionary 590-91 (8th ed. 2004). No evidence regarding the effect of Sequoia's arguably misstating the value of its assets in its schedules was presented. For these reasons, summary judgment cannot be granted to either party for Count 2.

(2) **Counts 3 to 5:** $5 million blanket TD and $1 million RRM/LHRC TD

Sequoia argues that the <u>retention</u> of these trust deeds by RRM <u>after</u> loans were obtained from third party lenders and individual trust deeds were recorded, constitutes avoidable transfers. It finds this, at least in part, in the definition of "transfer" at Bankruptcy Code § 101(54)(B) that a transfer can be "the retention of title as a security interest."[3] It further cites to an opinion of the Oregon Supreme Court to bolster its argument that the retention of a security interest could constitute a fraudulent transfer. *Coston v. Portland Trust Co.*, 131 Or. 71, 83, 282 P. 442 (1929). That opinion involved an interpretation of an Oregon law originally enacted in 1854 involving the transfer of property and protecting the transferee from the secret retention of an interest in the property transferred by the transferor. It does not appear that this opinion has any relevance to the question at hand.

Bankruptcy Code § 101(54)(B) provides that the retention of *title* as a security interest constitutes a transfer. For example, if a sailboat is sold and the seller retains title to the boat until the boat is fully paid for.

---

[2] ORS 95.210(1): "A debtor is insolvent if, at a fair valuation, the sum of the debtor's debts is greater than all of the debtor's assets."

[3] It is notable, but not ultimately relevant, that the quoted language is not part of the definition of "transfer" found in Oregon law.

Page 10 - Memorandum Opinion

The retention of title serves the same purpose as a transfer of a lien against the property by the buyer.  Both Oregon and federal bankruptcy law define "transfer" as every mode of parting with property or an interest in property[4].  The specifics given in the definitions are merely examples of parting with property or an interest in property.  *See* 2 Collier on Bankruptcy, ¶ 101.54[1] (16th ed.).  I do not find that the retention of its <u>security interest</u> by RRM constitutes the parting by Sequoia of an interest in its property under either Oregon or federal bankruptcy law.  For that reason, summary judgment will be granted to Defendant on Counts 3, 4, and 5.

(3) **Count 6**:  Bargain & Sale Deed as Part of Standstill Agreement

Sequoia executed a bargain and sale deed transferring its interest in the lots subject to RRM's and the individual lenders' trust deeds to PRLD.  Sequoia argues that the bargain & sale deed executed by it as a requirement of the Standstill Agreement was made for no consideration and thus constitutes a fraudulent transfer under Bankruptcy Code § 548, as made for less than reasonably equivalent value.  In fact, consideration for the bargain and sale deed was given by RRM and the individual lenders in their forbearance in foreclosing on the property.  Sequoia was in default under the terms of the notes and deeds of trust and RRM and the individual lenders had a legal right to foreclose on their interests in the property.  The bargain & sale deed induced RRM and the individual lenders to forbear by saving them the time and expense of foreclosure under their respective trust deeds should Sequoia default under the terms of the Standstill Agreement.  The evidence presented is not adequate to sustain a finding that the transfer was for less than reasonably equivalent value.  Summary judgment will be denied for Count 6.

// // //

// // //

// // //

// // //

// // //

---

[4] 11 U.S.C. § 101(54)(D),  ORS 95.200(12).

Page 11 -   Memorandum Opinion

CONCLUSION

For the reasons given above, Plaintiff's motion for summary judgment will be denied. Summary judgment will be granted on Defendant's cross-motion for summary judgment as to Counts 3 to 5 of Claim 6 and denied as to Counts 1 and 2. The Court will enter an order consistent with this Memorandum Opinion.

FRANK R. ALLEY, III
Chief Bankruptcy Judge